## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA



Filed/Docketed
Sep 27, 2012

| | |
|---|---|
| IN RE: | |
| **RICKY ALAN WILLCUT and TERRI ANN WILLCUT,** | **Case No. 10-12802-M**<br>**Chapter 7** |
| **Debtors.** | |
| **RICHARD A. WIELAND, UNITED STATES TRUSTEE,** | |
| **Plaintiff,** | |
| v. | **Adversary No.  11-01027-M** |
| **RICKY ALAN WILLCUT AND TERRI ANN WILLCUT,** | |
| **Defendants.** | |

### MEMORANDUM OPINION

In this adversary proceeding, Richard A. Wieland, the United States Trustee for this region ("Plaintiff" or "UST"), requests that the Court deny a discharge to Ricky Alan Willcut and Terri Ann Willcut (the "Willcuts" or "Defendants") under 11 U.S.C. § 727(a)(2)(A), (4)(A), and (4)(D).  The parties agree that substantial information is missing from Defendants' original bankruptcy schedules and statements.  Defendants argue that the omissions were inadvertent, while Plaintiff  alleges that the omissions were knowingly and fraudulently made.   The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and venue is

proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a).  The granting or denial of a discharge is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(J).

**Burden of Proof**

Plaintiff asks the Court to deny Defendants' discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (4)(A), and (4)(D).[1]  In order to prevail, Plaintiff must prove each statutory element by a preponderance of the evidence.[2]  Once Plaintiff establishes a *prima facie* case for denying Defendants' discharge under § 727, the burden of going forward shifts to Defendants.[3]  The ultimate burden, however, remains with Plaintiff.[4]  In order to further the policy of providing a debtor with a "fresh start," "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[5]  Even so, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."[6]

---

[1]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

[2]  *See* Fed. R. Bankr. P. 4005.  *See also First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *cf. Grogan v. Garner*, 498 U.S. 279 (1991).

[3]  *See Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984); *Everspring Enters., Inc. v. Wang (In re Wang),* 247 B.R. 211, 214 (Bankr. E.D. Tex. 2000).

[4]  *See First Union Nat'l Bank v. Golob (In re Golob),* 252 B.R. 69, 75 (Bankr. E.D. Va. 2000) (citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir. 1994)).

[5]  *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[6]  *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

**Findings of Fact**

*The Defendants*

The Willcuts have approximately 15 years experience in Tulsa area real estate development and the residential construction business. Despite having no formal post-secondary education, Defendants were quite successful in the residential construction business. Ricky Willcut supervised the construction side of the operations, while Terri Willcut was in charge of maintaining the financial side. On the advice of and with the assistance of professionals, separate business entities were formed that Defendants and third parties used to conduct various business activities and to isolate assets and liabilities. Defendants primarily conducted their residential construction business through a company named Willcut Properties, LLC ("Willcut Properties"). Defendants lived on an 80 acre rural ranch (the "Mounds Property"). In addition to living at the Mounds Property, they used the ranch to operate a business called Debonaire Farms, LLC ("Debonaire Farms"), through which they kept, boarded, and raised horses and grew and sold hay.

Financial problems, which included the recession of 2007-2008 and the downturn of the local residential real estate market, left Defendants with unsold spec homes and no regular income to cover debt service on construction loans. In an effort to address their financial problems, Defendants listed the Mounds Property for sale on October 21, 2008. It was originally listed with a realtor for $3,400,000. Valley National Bank ("VNB") and BB&T Mortgage ("BB&T"), who held claims as of October 2008 exceeding $1,000,000 secured by mortgages on the Mounds Property, agreed to the $3,400,000 asking price and to postpone foreclosure while Defendants attempted to sell the property.

A contract for sale of the Mounds Property for $3,400,000 was executed in November 2008, but, due to circumstances beyond Defendants' control, the sale failed to close. In February 2009,

the listing was renewed and the asking price for the Mounds Property was reduced to $2,875,000. An interested buyer engaged the realtor in extended negotiations but ultimately failed to sign a contract to buy. When that prospective sale fell through in August 2009, VNB and BB&T decided to proceed with foreclosure. As an alternative to foreclosure, Defendants, VNB, and BB&T agreed to offer the Mounds Property for sale at auction.

*The Auction*

On or about August 5, 2009, Defendants entered into an agreement with a local auction company to auction the Mounds Property, several horses, and a large volume of personal property (the "Auction"). The auction company estimated the Mounds Property alone would sell for $2,000,000 or more, and, with the consent of Defendants, VNB, and BB&T, a reserve price of $1,750,000 was set for the Mounds Property.

At the Auction, the highest bids for the Mounds Property totaled $1,550,000, which was $200,000 less than the agreed minimum bid. Defendants, VNB, and BB&T agreed to accept that price, although they did not immediately agree on how to divide the unexpectedly low sales proceeds. That dispute, as well as the backing out of one of the successful bidders, delayed the closing of the Mounds Property until March 3, 2010.

At the March 3, 2010, closing, out of the $1,550,000 received for the Mounds Property, VNB received $710,125.05; BB&T received $700,000.00; Tulsa County received $16,773.34 and $1,256.44 in payment of ad valorem taxes; the auction company received a $93,000.00 commission; and $10,316.28 went to pay closing costs and to reimburse the costs incurred taking care of the property between the sale and the closing. Defendants received $18,528.89 of the $1,550,000 sales price.

4

Gross sale proceeds from personal property at the Auction totaled $154,154.00.  Of that, the auction company got a sales commission of $23,123.10 (15%); creditors with liens on motor vehicles received payments of $6,750.00 and $8,489.24 for lien releases; and Defendants received $46,274.04 by direct deposit in their personal checking account at F&M Bank on October 8, 2009. The auction company held back the remaining $69,517.62 to cover its commission for selling the Mounds Property in case the sale did not close.

The personal property sold at the Auction included household goods and furnishings, riding horses, bridles, saddles, farm equipment, and a personal vehicle.  Among that personal property were:  assets included on the Debonaire Farms' depreciation schedules; assets included on the 2009 Tulsa County Assessor's Farm Personal Property Rendition as belonging to Debonaire Farms; assets included on Willcut Properties' depreciation schedules; and assets encumbered by filed mortgages and perfected security interests.  For example, a Pro-Walk Horse Walker was sold at the Auction for $19,500.  It had previously been pledged as collateral for a $30,000 loan from Arvest Bank to Debonaire Farms.  Arvest Bank did not receive the proceeds of the sale of the horse walker.

In July 2009, Defendants consulted with Mark Craige, a local bankruptcy attorney, about their financial problems and representation in several lawsuits that were being filed against them. Later in 2009, Defendants discussed options with Mr. Craige in light of the unexpectedly low proceeds from the Auction.  Mr. Craige provided general advice to Defendants regarding real and personal property that is subject to exemption from claims by creditors under Oklahoma law, the acquisition of an exempt homestead using the proceeds of the sale of their exempt assets, and the inadvisability of converting non-exempt assets to exempt assets on the eve of bankruptcy. Defendants did not tell Mr. Craige that some of the personal property to be sold at the Auction

appeared on the depreciation schedules of Debonaire Farms and Willcut Properties (the "LLCs"), and thus his advice did not consider this fact. Mr. Craige did not ultimately prepare or file any bankruptcy pleadings on behalf of Defendants. To the extent Mr. Craige gave Defendants any legal advice regarding what assets might qualify as exempt, it appears that the advice was of a general nature. The Court finds that Mr. Craige did not offer legal advice regarding whether specific assets could or should be claimed as exempt in Defendants' bankruptcy filing.[7]

In 2009, Bixby Lumber filed nine lawsuits in the District Court in and for Tulsa County, State of Oklahoma naming Rick Willcut as a defendant.[8] In conjunction with those suits, Bixby Lumber filed a notice of lis pendens in the office of the Tulsa County Clerk, identifying the Mounds Property as the subject of pending litigation and clouding title to the Mounds Property. Although the lis pendens appeared to be wrongfully filed, it created a cloud upon title to the Mounds Property that prevented the closing of the Auction sale. To resolve Bixby Lumber's claims against Defendant Ricky Willcut, and to obtain a release of the lis pendens, Defendants paid Bixby Lumber $39,600.00 of the $46,274.04 Auction proceeds they had received on October 8, 2009.

On March 3, 2010, when the sale of the Mounds Property closed, the auction company transferred $68,650 of the "hold-back" proceeds to Defendants by delivering a Bank of Oklahoma Official Check in that amount payable to Defendants. That $68,650, plus the $46,274.04 received by Defendants on October 8, 2009, from the sale of personal property at the Auction (together, the "Proceeds"), is the focus of this litigation.

---

[7] *See* Deposition of Mark A. Craige, Plaintiff's Ex. 67-26 to -32.

[8] Cases No. CJ-2009-6924, CJ-2009-6935, CJ-2009-6936, CJ-2009-6937, CJ-2009-6943, CJ-2009-6944, CJ-2009-6946, CJ-2009-6947, CJ-2009-6948, and CJ-2009-6949.

*The Jenks Property*

Following the sale of the real and personal property, Defendants acquired a new home located in Jenks, Oklahoma (the "Jenks Property") for the sum of $518,330.  The Jenks Property had been a spec home built by Caprock Homes, LLC ("Caprock"). Citizens Security Bank ("Citizens") had provided Caprock with a construction loan and held a first mortgage on the Jenks Property. Under terms dictated by Citizens, Defendants agreed to pay a down payment of $110,000 and assume Caprock's mortgage, while Caprock remains fully liable for all amounts due thereunder. Defendants also paid $25,000 as prepayment of the first 10 installments due under the note and mortgage.  Pursuant to the promissory note between Defendants and Caprock, Defendants must pay the principal sum of $415,000 at 5.7% per annum interest, with monthly payments of $2,408.66. This $415,000 note is secured by a first mortgage upon the Jenks Property.

Defendants came to the March 4, 2010, closing on the Jenks Property with Bank of Oklahoma Official Checks payable to Citizens in the amounts of $110,000 (the downpayment) and $25,000 (the 10 months of prepayments). The down payment came from the following sources: $68,650.00 from the Proceeds; $18,528.89 from the sale of the Mounds Property; $20,736.57 from Defendants' savings account; and $2,084.54 from Defendants' checking account.  The source of the $25,000 was a 2008 tax refund.[9]

*The Bankruptcy Filing*

On or about April 27, 2010, Defendants consulted with their counsel, Todd Maxwell Henshaw, regarding bankruptcy matters.  On August 13, 2010, Defendants filed a voluntary petition

---

[9] *See* Plaintiff's Ex. 10, Transcript of Hearing on the Objections to the Debtors' Claim of Exemption, at 141, *ll.* 8–11.

under Chapter 7 of the Bankruptcy Code.  Defendants filed their associated schedules and Statement of Financial Affairs ("SOFA") on August 27, 2010.  Defendants signed declarations under penalty of perjury in the Petition, Declaration Concerning Defendants' Schedules, and SOFA that the information provided was true and correct. On their Petition, Defendants indicated that their debts were primarily business debts.

Steven W. Soulé was appointed and continues to serve as Chapter 7 trustee.  The first meeting of creditors was held on September 14, 2010, and Defendants testified under oath that they had read the Petition, schedules, SOFA, and related documents before they signed them, that to the best of their knowledge the information contained therein was true and correct, and that all their assets and creditors had been disclosed, except that they needed to add a lawsuit and possibly one or two creditors that were omitted.

During the pendency of Defendants' Chapter 7 bankruptcy case, the UST requested statements for all financial institution accounts on which Defendants had signatory authority. Defendants provided documents for 8 bank accounts. The UST requested Defendants confirm that the statements provided were a full and complete response to the request.  Defendants affirmed their response.  However, based on Defendants' January 26, 2011, testimony at the hearing on the Objections to Debtors' Claim of Exemption, Defendants had at least one more bank account for which they had signatory authority namely, Debonaire Farms.

Defendants disclosed on Schedule B that Defendant Terri Willcut has a revenue interest in the Horner Family Trust, which provides income to Defendants.  In response to requests made by the UST for supporting documentation regarding the trust, Defendants asserted that they did not control the trust and did not have the requested documents, and that Les Horner, who does control

8

the trust, refused to provide documents related to the trust.  Other than their personal tax returns and

personal bank statements, Defendants did not provide any documents relating to the revenue interest.

The UST obtained copies of the documents from Les Horner and those documents show that the

revenue interest disclosed as coming from the Horner Family Trust is actually produced by

Defendant Terri Willcut's membership interest in Horner Family, LLC.[10]

*Admitted failures to disclose*

Defendants have stipulated that they failed to disclose the following information in their

original schedules and SOFA:[11]

1.       At the time of filing their bankruptcy, the following bank accounts were not

disclosed in Defendants' Schedule B or SOFA:

a.       Citizens Security Bank, Acct 4749, Debonaire Farms, LLC
    i.       Listed as a debt in Schedule F
    ii.      Debonaire Farms, LLC ceased operations 9/30/2009
b.       Valley National Bank, Acct 3424, Rick Willcut
c.       Arvest, Unknown account number, Marketing Unlimited, LLC
d.       Citizens Security Bank, Acct 8658 D, Rick A. Willcut
    i.       DBA: Willcut's Wicked Motor Sports
e.       Citizens Security Bank, Acct 9290 D, Rick A. Willcut or Terri A. Willcut
f.       Citizens Security Bank, Acct 9607 D, 75 Enterprises LLC
g.       1st National, Acct 5239, Willcut Properties, LLC
h.       Bank South, Acct 2626, Willcut Properties, LLC
i.       Valley National Bank, Acct 8443, Willcut Properties, LLC

2.       Defendants described closed financial accounts in their SOFA Question 11 by the

---

[10]  Defendants were ordered to turn over the income from this membership interest
received since the bankruptcy filing and going forward to the trustee on or before July 16, 2012.
*See* Judgment, *Case No. 10-12802-M, Docket No. 127*.   It does not appear that Defendants have
complied with that Order.  *See* Interim Report, *Case No. 10-12802-M, Docket No. 128*.

[11]  These stipulations are taken from the Pretrial Order, *Docket No. 20-1*. They have been
edited here as necessary to provide context and clarity and to add additional findings of fact
made by the Court.

name and address of the banks without including the account names or account numbers.

3.      Defendants' disclosure of the sales of personal property and equipment in their SOFA Question 10 does not include the value they received from the sales.

4.      Defendants did not disclose the sales or the value they received from non-auction sales of personal property (garage sale and sales to personal friend who owns M and E Interiors) that occurred within one year of their bankruptcy filing. Defendants did not disclose the personal property (furniture) given to Terri Willcut's mother and father within one year of their bankruptcy filing.

5.      Defendant Terri Willcut incorrectly identified her interest in a Limited Liability Company (Horner Family LLC) as an interest in a trust on Schedule B and in SOFA Question 2.

6.      Defendants' answer to SOFA Question 4 listed 21 of 22 pending lawsuits, omitting a lawsuit in the District Court in and for Tulsa County styled, Jeff Gudgel v. Rick Willcut, Case No. CJ-2009-8363. Defendants listed Mr. Gudgel as a creditor in their Schedule F, along with the names and addresses of the attorneys for plaintiff and defendant as additional parties entitled to notice.

7.      Defendants did not list on their Schedule J, their pre-petition house-sitting expense.

8.       In the answer to Question 14 of the SOFA, Defendants did not identify a 2006 Dodge Ram truck titled in the name of Defendant Rick Willcut's employer, Titan Construction, which Defendant Rick Willcut was allowed to use for business and personal purposes, and which was normally kept at Defendants' home.

10

9.      In their answer to Question 1 of the SOFA, Defendants listed net, but did not list gross income they received in prior years.

10.     Defendants' answer to Question 18 of the SOFA listed 27 businesses and corporate entities, but did not include listings for Family Time or Marketing Unlimited, LLC.

11.     Trojan Land Company, LLC is not identified in Defendants' answer to Question 10 in their SOFA.

12.     Defendants' answer to SOFA Question 10 did not include Defendant Rick Willcut's transfer of his membership interest in 75 Enterprises, LLC to the Lester E. Horner Trust.

13.     Within one year prior to their bankruptcy filing, Defendants transferred their interests in Horner Development LLC and 2005-LRJ, LLC, in order to avoid having the projects held up if the Willcuts decided to file bankruptcy.  Defendants' answer to SOFA Question 10 did not include Defendant Rick Willcut's transfer of his membership interest in 2005-LRJ, LLC to the Lester E. Horner Trust.

14.     Defendants' answer to SOFA Question 18 does not include all required information about the entities listed therein.

15.     In the answer to SOFA Question 3(c), Defendants did not include an October 2009 payment of $1,000 in wages to their daughter.

16.     In their answer to SOFA Question 9, Defendants did not disclose payments or property transfers to Mark Craige or David Rhoades in connection with services related to debt counseling and bankruptcy.

17.     In addition to any income derived from Titan Quality Construction Services, in the

11

year before filing bankruptcy, Defendants received over $200,000 for their use: approximately $135,000 from the Auction, $18,339 in lawsuit proceeds, $20,730 from the sale of another horse, $17,300 income tax refunds, and $14,000 in gifts, but did not list these in their answer to SOFA Question 2.

18.     Horner Willcut Investments, LLC's 2009 Federal tax return indicates that a $64,385.00 cash distribution was made to its members. At the time of the distribution, the Willcuts were not members of Horner Willcut Investments, LLC.

19.     On May 21, 2009, Ricky A. Willcut, as manager of Horner Development, LLC, signed a construction mortgage in favor of ONB Bank and Trust Company encumbering real property at 11205 South Lawrence Street, Jenks, OK 74037.

20.     On March 2, 2011, Ricky A. Willcut and Terri A. Willcut, as members of Willcut Properties, LLC, signed a Quit Claim Deed conveying real property at 11205 South Lawrence Street, Jenks, OK 74037 to Horner Development, LLC.

By e-mail dated June 7, 2011, Defendants' counsel advised Plaintiff's counsel that he had 18 boxes of Defendants' personal and corporate records and financial information in his office that had been gathered as part of Defendants' response to discovery requests in a related adversary proceeding and that they were available for review.  Plaintiff did not review or copy those records. To date, no amendments to the Petition, schedules, or SOFA have been filed.

To the extent the "Conclusions of Law" contains items that should be considered findings of fact, those findings of fact are incorporated herein by this reference.

**Conclusions of Law**

*Section 727(a)(2)(A)*

Section 727(a)(2)(A) of the Code provides that a discharge may be denied where "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition[.]"[12]  A party objecting under this section must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the debtor or estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.[13]

The heart of Plaintiff's claim under § 727(a)(2)(A) is that Defendants transferred and/or converted assets (i.e., the personal property sold at the Auction and/or the Proceeds) that were owned by the LLCs—and thus ineligible to be the subject of any exemption by Defendants—into an exempt asset, in the form of the Jenks Property, on the eve of bankruptcy.  In support of his case, Plaintiff attempts to walk a legal tightrope, wherein the Proceeds are both "property of the debtor[s]" for purposes of § 727(a)(2)(A), but property of the LLCs, and *not* property of Defendants, for purposes of Oklahoma exemption law and § 522.[14]  Plaintiff presented persuasive evidence that the

---

[12] § 727(a)(2)(A).

[13] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (citing *Gullickson v. Brown (In re Brown)*, 108 F.3d at 1290, 1292 (10th Cir. 1997)).

[14] In his closing brief, Plaintiff makes several references to the fact that Defendants did not own the majority of the personal property sold at the Auction, for the reason that it was listed on the depreciation schedules of both Willcut Properties and Debonaire Farms. *See* United States Trustee's Closing Argument, *at Docket No. 29.*

bulk of the personal property sold at the Auction belonged first and foremost to the LLCs and not

Defendants, and thus was not subject to a claim of exemption under Oklahoma law, either prior to

the Auction or afterwards in the form of the Proceeds.[15]  The evidence that Defendants had no direct

proprietary interest in the auctioned personal property drives a stake in the heart of Plaintiff's

§ 727(a)(2)(A) argument.  In *Mcorp Management Solutions, Inc. v. Thurman (In re Thurman)*, the

Court of Appeals for the Tenth Circuit made it clear that the transfer of an asset of a corporation is

not the kind of transfer of property in which a stockholder has an equitable interest to which

§ 727(a)(2)(A) would extend.[16]  *Thurman* limited the reach of § 727(a)(2)(A) to those transfers of

---

[15]  Defendants do not challenge Plaintiff's assertion that the auctioned personal property
and/or the Proceeds were property of Defendants for purposes of § 727(a)(2)(A).  In order to
support an exemption claim in the Proceeds after they are placed in the Jenks Property,
Defendants assert that they personally "owned" all of the personal property located at the
Mounds Property.  As stated *supra*, this is belied by the depreciation schedules attached to the
corporate tax returns of Willcut Properties and Debonaire Farms, which indicate that a large
portion of the assets sold at the Auction were held in the name of the LLCs.  *See* Plaintiff's Exs.
17 & 20. To support their claim of ownership, Defendants argue that the assets were titled in the
LLCs and listed on their depreciation schedules by accountants and others for "legal reasons,"
"insurance purposes," and "everything else."  *See* Transcript of Hearing on Objections to
Defendants' Claim of Exemption, *Case 10-12802-M, Docket No. 107*, at 24.  Despite
Defendants' misunderstanding of Oklahoma exemption law, and their unwillingness to challenge
this element of Plaintiff's claim, the Court concludes that the auctioned personal property and
the resulting Proceeds were property of the LLCs, and not Defendants.

[16]  *Mcorp Mgmt. Solutions, Inc. v. Thurman (In re Thurman)*, 901 F.2d 839, 841 (10th
Cir. 1990).  *See also Fowler v. Shadel*, 400 F.3d 1016, 1018 (7th Cir. 2005) ("The corporate
assets of [the corporation] are not property of the debtor and therefore cannot become property of
[debtor's] bankruptcy estate.  Hence, the question of an exemption does not arise."); *Rothman v.
Beeber (In re Beeber)*, 239 B.R. 13, 26 (Bankr. E.D.N.Y. 1999) ("An examination of caselaw
finds that § 727(a)(2) requires that the property in question be property of the Debtor or property
of the estate, not merely assets of a corporation where the Debtor is a shareholder of that
corporation."); *Riumbau v. Colodner (In re Colodner)*, 147 B.R. 90, 93 (Bankr. S.D.N.Y. 1992)
("The key factor with respect to an allegation under subsection (2)(A), or under subsection
(2)(B), is that *the debtor* must have engaged in the proscribed conduct and that the property
involved was property of the debtor or property of the debtor's estate."); *First Nat'l Bank of
Santa Fe v. Orr (In re Orr)*, No. 11-19580-ABC, 2011 WL 5854712, at *4 (Bankr. D. Colo. Nov.

14

property in which the debtor has a direct proprietary interest, and held that it did not include property in which the debtor has a derivative interest.[17]  The court in *Thurman* specifically rejected the theory that the estate of a debtor who holds a share in a corporation would include a liquidatable interest in any asset owned by that corporation.[18]

In an attempt to salvage his case, Plaintiff argues that the fact that Defendants exercised dominion and control over the Proceeds is sufficient evidence of their property interest therein, even to the point of declaring that "[Defendants] interest in the [Proceeds] was not derivative; it did not arise from, and the [Defendants] did not act on behalf of, another entity."[19]  Under Plaintiff's own evidence, Defendants' interest in the Proceeds flowed directly from the interest of the LLCs in the auctioned property.  As managers of the LLCs, Defendants had the authority to dispose of or transfer any property of the LLCs.[20]  Any wrongful distribution of assets to themselves in violation of title 18, sections 2030 or  2040(A) of the Oklahoma Statutes, would potentially create a cause of action under title 18, sections 2031 or 2040(B).[21]  What Plaintiff essentially argues is that Defendants

22, 2011) ("Allegations that property of a corporation, in which a debtor has an interest, was transferred with fraudulent intent fails to allege the second element of a § 727(a)(2)(A) claim.").

[17]  *In re Thurman*,  901 F.2d at 841.  Under Oklahoma law, a membership interest in an LLC is personal property, but "a member has no interest in specific limited liability company property."  Okla. Stat. tit. 18, § 2032. Therefore, Defendants did not have a direct proprietary interest in LLC assets to which an exemption could have attached.

[18]  *In re Thurman*,  901 F.2d at 841.  Whereas *Thurman* specifically dealt with a shareholder of a corporation that had transferred assets, other courts have applied these principles  to the transfer of assets of a closely held LLC. *Ne. Neb. Econ. Dev. Dist. v. Wagner (In re Wagner)*, 305 B.R. 472 (8th Cir. BAP 2004).

[19]  Plaintiff's Closing Argument, *Document 29*, at 27.

[20]  *See* Okla. Stat. tit. 18, §§ 2019, 2019.1, 2039.

[21]  *See* Okla. Stat. tit. 18, §§ 2030, 2031, 2040.

wrongfully distributed the assets of the LLCs, and then squirreled away the resulting funds in the Jenks Property in order to claim an exemption and to protect those funds from creditors.[22]  While Defendants may have wrongfully distributed property of the LLCs during the winding up of those entities, such conduct does not satisfy § 727(a)(2)(A).[23]

*Section 727(a)(4)(A)*

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where the debtor "knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account[.]"[24]  The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[25]

The Fourth Circuit has held that

> [i]n order to be denied a discharge under this section [§727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath

---

[22]  Whether we depict the conversion as being of the personal property immediately prior to the Auction, or of the Proceeds once in the hands of Defendants does not change the analysis.

[23]  *Thurman* rejected the proposition that "the transfer of property of another which has incidental effect upon the assets of a debtor satisfies the requirements of §727(a)(2)(A)."  *In re Thurman*,  901 F.2d at 841.

[24]  § 727(a)(4)(A).

[25]  *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

16

within the meaning of § 727(a)(4)(A) is a question of fact.[26]

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4)(A).[27]   Omitted information has been deemed material where it "concern[s] the existence and disposition" of a debtor's property.[28] Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case."[29] At least one court has noted that "the greater the number of assets or transactions that are not disclosed, the

---

[26] *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations omitted). *See also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("In order to deny a debtor's discharge pursuant to this provision [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.").

[27] *See Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

[28] *Id.* (citing *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

[29] *Id.* at 955-56.  Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2).  The United States Court of Appeals for the Seventh Circuit has held that

> [t]o find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud.  The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied.  The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct.  Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.

*In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted).  *See also Kaler v. Olmstead (In re Olmstead)*, 220 B.R. 986, 994 (Bankr. D.N.D. 1998) (quoting *Yonikus*); *Rezin v. Barr (In re Barr)*, 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997) (fraud "may be proven by evidence that Defendants were aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

greater the inference of intent to defraud."[30]

The United States Court of Appeals for the Tenth Circuit has given us further guidance in the application of § 727(a)(4)(A).  It has held that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."[31]  We have also been instructed that "an honest error or mere inaccuracy is not a proper basis for denial of discharge."[32]  But a debtor may not escape a denial of discharge under § 727(a)(4)(A) by asserting that the omitted information concerned assets that he or she believed to be worthless.[33]  One court summarized the law in this regard as follows:

> As a matter of law, no inference of fraudulent intent can be drawn from an omission when the debtor promptly brings it to the court's or trustee's attention absent other evidence of fraud. *In re Brown*, 108 F.3d at 1294. Further, a debtor's voluntary filing of an amendment as soon as practicable may be accepted as evidence of the absence of the element of the fraudulent intent necessary to sustain a § 727(a)(4)(A) claim. *In re Kelly*, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992); *In re Shebel*, 54 B.R. 199, 202-205 (Bankr. D. Vt. 1985).  An inference of fraud is permissible, however, when the evidence indicates that the amendment is not in fact

---

[30]   *Law Office of Larry A. Henning v. Mellor (In re Mellor)*, 226 B.R. 451, 459 (D. Colo. 1998) (citing *In re Calder*, 907 F.2d at 956) (finding "not one but four separate omissions").  *See also Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d at 252 ("not one false oath, but three, and that the effect of these false oaths was to conceal from the bankruptcy court and the trustee a pattern of gratuitous transfers of property").

[31]   *In re Brown*, 108 F.3d at 1294.

[32]   *Id.* at 1295.

[33]   *In re Calder*, 907 F.2d at 955 (citing *In re Chalik*, 748 F.2d 616 (11th Cir. 1984)).

voluntary because the amendment is offered only as a result of developments during the meeting of creditors, after the debtor "knew that the cat was out of the bag," well after the meeting of creditors, or without adequate explanation of the reason for their initial inaccuracy. *In re Mumin*, 1998 WL 160992, *3 (Bankr. E.D. Pa. 1998) (unpublished opinion) (collecting multiple cases).[34]

There appears to be one thing on which Defendants, Plaintiff, and the Court can agree: "there are a remarkable number of errors and omissions in [Defendants'] original bankruptcy schedules and statement of financial affairs."[35]  Despite such an acknowledgment by Defendants, amendments to Defendants' schedules or SOFA have never been filed.  The vast majority of the errors and omissions revealed in the pretrial order appear to be the result of investigation and questioning by the UST or Chapter 7 trustee, and not the result of voluntary disclosures by Defendants.[36]  In addition, a large number of omissions were indicated as "To be supplied" in Defendants' SOFA, but no amendments were ever forthcoming.[37]

While Defendants' failures to disclose information are numerous, the most egregious relate to the sale of the Mounds Property, the personal property sold at the Auction, and the purchase of

---

[34]  *In re Mellor*, 226 B.R. at 459–60.

[35]  Debtors' Closing Argument for Trial Conducted April 11–12, 2012, *Docket No. 30*, at 26.

[36]  For example, at Defendants' § 341 meeting held on September 14, 2010, Defendants disclosed a single "lawsuit [that] arrived after the case was filed," but indicated that they were unaware of any other changes that needed to be made to their schedules or SOFA. Transcript of 341 Meeting of Creditors, Plaintiff's Ex. 5-3, *l.* 8–9.

[37]  Admitted Fact No. 52, Pretrial Order, *Docket No. 20-1*, at 9.

the Jenks Property.  Question 10 of the SOFA directs debtors to "List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case."[38]  The only information included in Defendants' schedules or SOFA regarding these transactions is a response to Question 10 in Defendants' SOFA that states:

> Real and personal property belonging to Debtors and corporate entities owned by Debtors was sold at auctions.  The sales are not itemized herein due to the volume of sales and the mixing of information about the sale of the non-Debtor property. Complete records will be supplied to the chapter 7 trustee.[39]

Nowhere is disclosed the $110,000 downpayment on the Jenks Property, the $25,000 pre-payment of 10 mortgage payments, or the $39,000 paid to Bixby Lumber as part of a negotiated settlement to remove the lis pendens from the Mounds Property.  Although Defendants' interest in the Jenks Property was disclosed in Schedule A, there was no disclosure of the elaborate relationship between Defendants, Caprock, and Citizens.  Defendants claim that "it did not occur to them" that the mortgage pre-payments should be disclosed in response to Question 10.  Absolutely nothing about the purchase of the Jenks Property was in the ordinary course of the business or financial affairs of Defendants, whether looked at subjectively or objectively.[40]  Defendants were quite careful that none of the details of that transaction found their way onto the schedules or SOFA.  The Court concludes that the failure to disclose the details of the transfers both to Citizens and to Bixby Lumber were part

---

[38]  Question 10(a), Official Form B 7 (4/10), at 5.

[39]  *Docket 21*, at 62.

[40]  The purchase of a home is a significant undertaking that would not qualify as being in the ordinary course of business of most individuals, and certainly not the Willcuts.  Even if an argument could be made that the purchase of a home is a fairly routine matter, this home purchase involved pre-paid mortgage payments and kept the seller liable on the mortgage, which under any objective standard is far outside of industry standards.

of a calculated scheme designed to protect their claim of exemption in the Jenks Property from the scrutiny of the trustee and other parties in interest.

In addition to the sale of the Mounds Property, the Auction also generated $154,154 from the sale of personal property.  Included in the personal property were assets owned by Defendants as well as the LLCs.  Although records regarding what personal property was sold at the Auction were eventually provided to the trustee, there has never been an accounting of which of the three entities (Defendants individually, Willcut Properties, or Debonaire Farms) owned the various pieces of property.[41]  Defendants' response to Question 10 of their SOFA indicates that complete records would be supplied to the Chapter 7 trustee.  Leaving aside the question of whether providing information to the Chapter 7 trustee alone satisfies the disclosure requirements of Question 10, it does not appear that adequate information clarifying the ownership of the personal property sold at the Auction was ever forthcoming from Defendants.  What little information regarding ownership is available has been gleaned from the depreciation schedules of the LLCs' tax returns and from a laborious investigation by the UST and the Chapter 7 trustee.

Defendants take the position that they "owned" all of the personal property and were therefore free to liquidate it and fold all of the Proceeds into the Jenks Property, for which they claimed the full exemption allowed by Oklahoma law.  But the focus of § 727(a)(4)(A) is not on "ownership"—it is whether Defendants knowingly and fraudulently made a false oath or account by purposely withholding details of the interests of the LLCs in the personal property in order to thwart the trustee's investigation into the details of the claimed exemption.  To the extent that assets

---

[41]  Although Defendants assert that they personally "owned" all of the personal property located at the Mounds Property, the Court has rejected this assertion as a matter of fact.  *See supra* note 15.

belonged to the LLCs, any inappropriate liquidation or distribution of those assets as part of the winding up of those companies may have exposed Defendants to liability under Oklahoma law.[42] By refusing to provide an adequate accounting and disclosure of the ownership of the auctioned personal property, Defendants knowingly and fraudulently impeded any effort of the trustee to investigate the extent of such liability by Defendants to the LLCs.  While it may have conflicted with Defendants' other objectives, i.e. supporting their claim of exemption in the Proceeds of the auctioned LLC property, such disclosure is expected and required of Defendants seeking a discharge under the Bankruptcy Code.

Defendants did not disclose the transfer of $39,000 to Bixby Lumber.  Defendants stated that this transfer was made to remove a lis pendens that was improperly filed on the Mounds Property. Defendants argued that because it was a payment to a creditor made more than 90 days immediately preceding the commencement of the case, it was not required to be disclosed in Question 3 of the SOFA.  Such may be true, but it was property transferred within two years immediately preceding the case and clearly not transferred in the ordinary course of the business or financial affairs of Defendants, making it a required disclosure in Question 10 of the SOFA.

While Defendants portray the foregoing omissions as inadvertent, the Court concludes that they were part of a scheme by Defendants to protect their claim of exemption in the Jenks Property and to thwart any inquiries by the Chapter 7 trustee and creditors into these transactions.  It became clear from Defendants' testimony that they had expected to receive significantly more from the sale of the Mounds Property than they ultimately walked away with.  By the time they became aware that they would receive less than $19,000 in equity from the Mounds Property sale, they had already

---

[42] *See* Okla. Stat. tit. 18, §§ 2031, 2040.

engaged in extensive negotiations and made commitments to purchase the Jenks Property.  Instead

of taking a step back and reevaluating the wisdom of making that purchase, given their altered

financial situation, Defendants proceeded full steam ahead.  Defendants did not stop to take a

thorough and exacting inventory of which entity owned the personal property sold at the Auction,

but instead paid off Bixby Lumber to facilitate the sale of the Mounds Property and then quickly

used the remainder of the Proceeds, in addition to other money whose source was never adequately

accounted for, and folded it into the Jenks Property so that it would be protected from creditors in

the form of a homestead exemption.  The Court finds that the disclosures made by Defendants

regarding these transactions were purposely vague in order to hinder and deter the trustee and parties

in interest from conducting a full inquiry that could potentially uncover some inconvenient answers

regarding Defendants' claimed homestead exemption.  The Chapter 7 trustee as well as the UST

have been required to spend substantial resources to understand transactions that should have been

fully laid bare in Defendants' schedules and SOFA. The Court finds that Defendants knowingly and

fraudulently failed  to provide sufficient disclosures regarding the purchase of the Jenks Property

and the source of the money used to complete the purchase, and that such omissions are material.

The Court concludes that Plaintiff has satisfied his burden under § 727(a)(4)(A).[43]

---

[43]  In addition to the personal property sold at the Auction, Defendants transferred
personal property through garages sales, sales to friends, and gifts to parents, none of which was
disclosed.  Among the other omissions were 9 checking accounts that were not disclosed in
either Defendants' Schedule B or SOFA.  Although these were later discovered by the UST, it
does not appear that the disclosures were voluntary.  *See* Transcript of 341 Meeting of Creditors,
Plaintiff's Ex. 5, at 5-3.  Nor have Defendants' schedules or SOFA been amended to reflect
them.  In addition, the information provided regarding closed accounts was incomplete.  Several
transfers of corporate interests were not disclosed.  Admitted Facts Nos. 41 & 43, Pretrial Order,
*Docket No. 20-1*, at 8.  Defendants misidentified an income-generating LLC as a trust, and did
not correct the name even when asked to provide documentation regarding the same.  Defendants
failed to report payments made in money and property (i.e., a car) to professionals that had

**Conclusion**

The Court is mindful that objections to discharge should be construed liberally in favor of debtors and strictly against objecting parties.[44]   The Court also recognizes that a bankruptcy discharge is a privilege reserved for the honest debtor.[45]   The Court concludes that Plaintiff has met his burden by a preponderance of the evidence with respect to Defendants.   Defendants have not presented sufficient evidence to overcome the inference of fraudulent intent.   The Court concludes that the discharge of Defendants should be denied under § 727(a)(4)(A).   As a result, the Court will not consider Plaintiff's claims against Defendants under other sections of § 727.[46]

A separate judgment in accordance with this Memorandum Opinion is entered concurrently herewith.

Dated this 27th day of September, 2012.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6375.1

---

provided bankruptcy and debt counseling advice.  *See* Plaintiff's Exs. 57–58.  While, standing alone, none of these things would be enough to support an action under § 727(a)(4), together they suggest a reckless or knowing disregard for the seriousness and completeness of the disclosures required of debtors, and provide additional support for the Court's conclusion that Defendants are not entitled to a discharge in this case.

[44]  *See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[45]  *See In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996); *Panda Herbal Int'l, Inc. v. Luby (In re Luby)*, 438 B.R. 817, 826 (Bankr. E.D. Pa. 2010) ("[W]here a debtor has been dishonest in his dealings with the court or his creditors, it may be appropriate to deny his discharge, notwithstanding that an underlying goal of federal bankruptcy law is to provide a debtor with a fresh start.").

[46]  *See Woolman v. Wallace (In re Wallace)*, 289 B.R. 428, 436 (Bankr. N.D. Okla. 2003).

24